I guess you showed it to Pogon's and council is this the first you're seeing it on their police side what's that you're on I want to make sure they don't have any objection to but what you get next to the microphone so we can be going to show your honor I think it has some photographs in there it's the final award has a couple of the affidavits and a few excerpts from the depositions I want to call out your honor I represent Woodsboro Farmers Cooperative my name is John Swallow we're the appellant in this case I asked for some moral arguments today primarily I wanted to call out some of the facts of the case and explain some of the facts and talk about that with the court I think they're very important Woodsboro Farmers Cooperative it's a it's a farmer owned business it's a cooperative it's a group of individual farmers out on near Corpus Christi Texas it's about 50 miles north of Corpus Christi banded together to basically procure goods for their farms help get their farm their products to market assist each other in their businesses kind of pulled pull their resources together but primarily they farm and sell sorghum milo soybeans corn grain crops and so this case is about a couple bins silos that were constructed and so I want to talk a little bit about the history of the project then a little bit of history history at the the court proceedings in the district court and then if I have some time left to talk a little bit about the case law and how it applies here yes your honor set your own priorities where you gave us maybe most of this in your briefing I do think the law is going to be significant in this and so I would consider it if I have time I'll get to it I will talk about the law as well I think the the facts in this case and how they apply the law are going to be crucial and so I do want to highlight some of those now the the appellant with Burroughs Farmers Cooperative entered into a contract to build a grain silo to purchase and build a grain silo they entered in this contract with the defendant EF Irwin who was in the underlying arbitration they had worked with EF Irwin in the past they were happy with the work they'd done they entered in this contract didn't have a bond Irwin was the company the I used to call it general contractor it was insured by the appellee today and so they had a commercial general liability policy with the appellee they in April of 2013 they entered into the contract they ended up purchasing two grain silo bin kits from Irwin and so these these these silos there and I'm sure you've all seen them probably in the countryside there's these about a hundred foot towers they're made out of metal and they they're purchased in kits they're called Brock kits and so they they purchased these kits from Irwin in April 2013 and the kits basically come on a flatbed truck they get delivered got delivered to the Woodsboro Farmers Cooperative at that point they their property they own the kits and and then they hired Irwin who ended up turning around and hiring AJ constructors to assemble the kits and you might imagine these these kits are a bunch of metal parts they're they're purlins they're joists there's a basically corrugated metal sheets that form the the outer shell of this and then struts and different things that reinforced the the structure it's kind of like an erector set I don't know if you all played with erector sets when you're kids but you have to bolt bolt all the pieces together and the in this case AJ constructors was the one that hired to to bolt these together and this is in your packet this this is a picture of the bin as it's going up I believe or coming down one or the other but when when they build these kits they they basically start with each ring gets put together and so each ring has to get put together and the roof the roof kind of goes on first and the roof has to be supported by purlins and joists and these metal parts and they all have to get bolted together correctly this work was done by AJ constructors in June of 2013 and so at that point the the essential the the construction of that part of the project had been completed by AJ constructors Irwin came back out and they added catwalks the the grain elevators they go up to the bins the the ramps and a bunch of other things fans and different things that had to be installed now the the important part on this is the the defect in the construction the primary defect that ended up leading to all of the the damages in in why the facts are important are the way that they were bolted together because when you bolt these things together you have to make sure that each of the bolts is torqued down correctly and so the major defect in this construction case is that the AJ constructors the subcontractor didn't torque down all the bolts and there's some pictures in here and you can see this where you have loose bolts they didn't get they didn't get torqued down now Woodsboro Farmers Corrupted it's it's gone out on the coastal plain there it's out in the farm fields and there's a lot of wind and such that comes off of the ocean comes across the plains and so these things not having been torqued down not having all the you know pieces connected up properly they start moving in the wind and shifting and so the damage occurs after the can after the construction is complete to these parts and the damage becomes most apparent kind of in November 2013 time frame at that point EF Irwin who's the the general gives them a certificate of completion they say the project is done they turn over the project and at that point they're kind of poised essentially to be put into operation they're ready they wanted to them to put grain in them for that fall. They turn over the silos they say here's your certificate of completion. You asked about that, I thought there was some question about when you look at potential damages to this whether it would have been completed in time for that year's crop. And that's part of the damage. Is the evidence there that even under proper construction that the silos would have been available for that year's crop? Well that is a good question that's about a hundred and sixty seven thousand dollars of damages. I believe it had the silos been completed timely at that point I believe they would have been available for that year's crop and you know they can talk about that. I am NOT a farmer but I think crops come in as late as November and so they wanted to start putting grain in at that point. What you have in November is you have some storms come through some rain storms and you know they're ready to put the grain in the bins and they notice some leaks. And so at this point what's happening is these these structures are moving and there's some there's some pictures in the packet that's provided of actual bent metal pieces. This is one of the reasons I say. What is the evidence in the record? This was summary judgment was it not? That supports your understanding or your theory that's that it's wind and whatever else destroying the poorly constructed damaging the poorly constructed silo as opposed to it being specifically a damage resulting from the construction itself. That's very important. What is the evidence? The finished him. The evidence in the record I think you need to go look at the affidavit of Buck Pitcock is extremely instructive. Buck Pitcock is the he's the he's a silo person he's done this for many many years he's the person they hired to come out and inspect them and put back together. You also need to look at the the deposition or disposition and affidavit of Roxanne Wiginton who was a general manager out there. When EF Irwin also who was the principal of EF Irwin Inc. who was a general testified that there was you know basically these things were turned over. They appeared sound structurally sound Roxanne also testified about that. It looked like the bins were in good condition. Everything was as it should have been. They were poised to be put into into into use. EF Irwin testifies another wind storm comes through. It moves things around and that's part of the packet too is his deposition testimony and the leaks open up again. And so what you have is this series every time there's a wind storm a rain event the the silos are moving around and they're opening back up again. You're getting bent metal metal parts. You're getting bent purlins. The metal in this because if you don't tighten them all up if they're not tightened down sufficiently the their strength of the structure comes from them being put together in a tight fashion. This is you know whatever it is you know it's it you or I cannot bend that but it is pretty flimsy. You have a hundred foot silo. It's this thin kind of outer core and so all this has stuff has to be tightened down correctly in order for it to function correctly in order to be structurally sound. And so when the the contractor the subcontractor came through and it didn't tighten down all the the bolts it left this ticking time bomb in essence. Well the time we have left we do this is an insurance case. We have some policy provisions and we also have an arbitration award. Why don't you cut. Let's talk about some of the policy provisions. Obviously my burden as the as the insurer the person seeking insurance through the coverage through the insured is to show that there's coverage okay that there was an occurrence. The there's plenty of evidence in the record. Nobody thought that the these were intentional defects you know the they testify that they followed the specs they intended it to be constructed according to plans. The next one is that there was fit some sort of physical injury to the property that there was some sort of damage in order to show coverage. And so one of reasons I brought the pictures today and I'm somewhat mystified by the district courts ruling that there was no damage because it seems fairly evident by both the testimony of Mr. Pitcock by Roxanne and by the actual pictures that there was physical damage to these structures. The metal was actually you know as it twisted in the wind it was actually bending and tearing apart and so I believe there's coverage. Now there was some of the exclusions that were assumed were basically the business risks or they were put forth by the appellee or the business risk exclusions. This is the damage that is done by the contractor during the work. Well this damage the the when the silos were put together Mr. Irwin, Roxanne Wiggington, the co-op people, everybody thought they were done correctly. There weren't any major defects at that point. The the damage, the leaks, the major defects didn't become apparent until afterward. And so the the evidence in the record shows that the damage occurred afterwards due to a defect that occurred during the work. I think J6 is the the other exclusion they rely on. Again that's a a business risk exclusion. Again that only excludes coverage for that particular part of the property that's that's subject to the defect. And of course the defect in this case is the bolts. It's also there's an exception to J6 and the exception basically re-establishes cover coverage after the project is complete. And so we're not talking about damages that occurred during the project. We're talking about damages that we're seeking coverage for that occurred afterwards. And Mr. Pitcock testified once once you had all this bent metal, all these these defects, it wasn't just going back in and replacing the bolts on the project. You there was actually in one of the other exhibits in the exhibit that Mr. Pitcock showed, which is here, the invoice or the sheet that was prepared by Mr. Pitcock, showing they actually had to go out and purchase a completely new roof at $114,000. Is that an exhibit and so what exhibit? It is part of the record in the appeal, yes your honor. And so in terms of that exclusion, J6, you the damage also was to a different part of the property than was the subject of the specific defect. And so those those exclusions do not apply. The other one that the exclusion they rely on is exclusion M, which I think was dealt with in in the Cook case. Exclusion M relates to impaired property and so when you have a defective part or part that doesn't work that's incorporated into the property that would apply. Here we don't have a defective part. I think the the bins were delivered, they were not defective when they delivered, they were not damaged when they delivered, the work was defective. They just didn't torque down the bolts correctly and this allowed the structure to move and become damaged after the work was completed. And so in terms of it wasn't a matter of going in and replacing defective bolts, the bolts were fine. They got damaged, a lot of them. There's a picture of a damaged bolt in here as well because they actually, you know, some of them got torn out, but the the the product was not defective. The issue was the defective work that ended up causing damages after the project was completed. I think that's about my time. I'm sure I will have some remoto. I have time to respond. May it please the Court. I'm Jay Sever. Excuse me. I represent TIG, the insurance company here, and really I'm only going to talk about insurance, unfortunately, probably for you, but the key question here is is really whether the coverage grant of this insurance policy, which is a contract of course, issued to the entity that was held liable by the arbitration panel was triggered, was triggered because of an occurrence causing property damage during the policy was in effect between 2013 and 2014, so you have to have an occurrence causing property damage during that policy period. You're probably about to say, but let me ask it now, lay that policy period on top of the finishing of the construction of the silo and the wind damage. Well, okay, we'll talk a lot about the wind damage, I promise, but the the construction was done during the November 2013, right smack in the middle of the policy period. No question about that. What month? It was finished in November 2013, I believe. July or something? What month is the start and finish? Oh, starting and finishing the policy is February of 14 to February of 14, okay, but what's critical here is that this is an instrument that provides coverage for the liability of EF Irwin, the company that put in these silos, and so we have to look at what EF Irwin is liable for, and there's got to be property damage that they're liable for, and thankfully here, this isn't always the case with an arbitration, but thankfully here we've got an arbitration award that explains what EF Irwin is liable for, and you know they're real clear that that it is based upon the fact that the storage bins erected as part of the scope of work were defectively constructed and could not be placed into service as constructed or as repaired. We further find that the erection work performed by AJ, which is the company that was subcontracted, was negligently performed. It did not comply with the terms of the subcontract. This is critical because it is a description of the nature of the liability, which is solely for putting in a defective product, and when we focus on the policy language which requires physical injury to tangible property, and you look at all of the body of Texas law, including plenty of cases by the Texas Supreme Court and this Court, making very clear that faulty work in itself is not property damage, you conclude that there is no property damage in this case. The District Court was very careful in going through meticulously the Texas Supreme Court law on this, making clear that unless there is some other attenuated damage caused actually occurring after you put in the bins here, after you put in these silos, you don't have any property damage. What if you have a situation, I take it as presented here, which is defectively assembled, something that you could theoretically fix at that moment, but it's not fixed, and therefore, as a result of whether the item becomes substantially damaged over time? Tell us why Texas law forbids liability in that . . . That's what we're dealing with here, right? Initially defectively assembled, and because of that, damage over time due to exposure to the weather? No, that is not what we're dealing with. What we're dealing with here is the determination by the arbitration panel and the evidence presented that these were not fit to store grain. That is what we're dealing with here, and that's why I read what I read from the arbitration panel, because what they found is that these bins were not ready to be put into use. This testimony about grain damage . . . So you're acknowledging that it was more damaged over time, but you're disputing . . . or are you saying all the damage that took place at that moment? There was an affidavit put in on the day their motion for summary judgment opposition was due. That affidavit said that when they took apart these bins, and while they were repairing these bins, they found some bent metal parts. And what I'm saying is that that supposed wind damage, even if you accept it as true, has nothing to do with the liability of E.F. Irwin here. Nothing at all. The liability of E.F. Irwin . . . Just to be clear, we're talking about a fact dispute? We're not. We're not talking about fact disputes at all, because the liability is very clear that they had to replace these bins because they weren't fit for their use as silos. That's the only testimony that's relevant. The idea that when you went to repair these things, you found bent metal parts is wholly a defective roof. It's clear that it's defective. And while they're replacing the roof, they find a couple of tiles that are broken. Is that the relevant property damage? No. The relevant property damage is the fact that they had to replace a defective roof. There wasn't any real property damage caused by that roof. It's the same thing here. The fact that they may have found some bent metal parts as they were replacing the silos has nothing to do whatsoever with what the arbitration panel was talking about when it said you have to replace these silos because they are not fit for their use as silos. That's the issue. There isn't any kind of a factual dispute here. The testimony that's being focused on by the appellant has to do with the repair of these things. In finding apparently some metal bent parts in doing the repair, that doesn't change the nature of the liability that the insured has in the case. That's why I'm focused on the arbitration ruling. That's why the district court was focused on the arbitration panel ruling. Moreover, there is no testimony whatsoever about the timing of the supposed wind damage. Again, I'm not suggesting that we need to go do discovery on this issue because it's not relevant to the liability that EFR 1 had here. But understand that this is 2014. The first time they went out and inspected this stuff, they thought there was nothing wrong with it at all and they were hoping they could put it back into use by tightening some bolts. That was after the policy was expired. By the time they took the pictures that the appellant is talking about here, we're talking years after the policy has expired. There is absolutely no testimony anywhere that there was wind damage during the policy period, which of  policy was expired. The policy was expired in the first three months after they finished the project. So there just isn't sufficient support anywhere to suggest . . . Counselor, I know what you're saying. It seems to me your position is that the policy has expired is irrelevant, that the kind of damage being talked about here is not what the arbitration panel identified. Is there a claim there in the arbitration, a potential claim there and the arbitration panel just didn't accept it? Are you saying either because of the policy language and its exclusions or because of the nature of the initial claim or something else that that issue wasn't really before the arbitration panel? I'm saying that the issue . . . I gave you a lot of choices. Do what you want to with all that. Any wind damage, any of this stuff that we're talking about here was not before the arbitration panel. Why would that be? Because it does . . . is it late discovered by opposing . . . Right. It was not . . . It does seem to me, certainly very much now in the briefing by his side, it's teed up as being exactly that. Right. The position that everyone was worried about in the arbitration was whether these bins needed to be reconstructed and needed to be replaced basically. A whole new bin, a whole new set of parts. Having to do with the fact that they were inadequately built with bolts that didn't hold them together. There was . . . we have no indication and certainly nothing on the basis of the arbitration award that there was any testimony about wind damage or any other supposed property damage well after these things were put into their faulty position as bins that didn't work. The arbitration is focused on the fact that they were not fit for their purpose, not that there was any sort of damage. Your theory, the narrative that you're putting forth is essentially that this is a theory that was developed purely for this insurance case. This was not the issue back then. Yeah. I'm trying not to be too cynical . . . I'm trying to understand both sides here. I said that the affidavit was signed the day it was because I do believe that it is a theory that is an attempt to bootstrap something that was found while they were repairing these things to try to get coverage, but because this is a policy that responds to liability, we have to look at the nature of the liability and that's all we can look at. We really can't look at what happened while you were repairing these bins. What's important with the Texas courts is that they are very, very careful in trying to separate that which is having to replace a product or an HVAC system or a foundation that doesn't otherwise cause property damage with the situation where there actually is property damage. In all of the cases where the Texas courts and the federal courts find that there's actually coverage, they're actually looking at property damage being the nature of the liability. Judge Southwick, I do want to make sure you understand we are saying there is no property damage as part of the liability of EF-R1 here, who, by the way, isn't present, but yeah, I think ultimately the testimony that we're talking about is wholly irrelevant and the only thing one needs to look at is what the district court carefully looked at and that was the arbitration ruling in itself, which was very well reasoned and thankfully, unlike a lot of arbitration rulings, went through why they were awarding damages to Woodsboro. So we didn't talk and I haven't spoken about the exclusions. The only exclusion that really is relevant here is J-5. The court found that J-5, which is an exclusion that applies to property damage to real property, excludes any damage for replacement or repair to that particular part that is essentially put in incorrectly, that is faulty work. And here, because these bins were attached to the ground, they were real property. There's no question there. And so I don't think you get to the exclusions. There's no real reason for you to consider the exclusions because you don't get past the property damage requirement here. But if you do, for the same reasons that the district court made clear, this is damage to that part of the property, which is the entire bin structure that the insured put in because you have to go back to what it is that the insured is being held liable for and that's all of their work to these bins, not just some portion, not just some bolts and certainly not the roof parts alone. They were being held liable for putting in defective silos that did not work. The only other issue that I would like to talk briefly about is that the timing of the damage, just again, there's no suggestion, no suggestion that there's a And of course, as we started with, expired in February 2014. For there to be evidence of property damage during the policy period, there'd have to be something that suggested actual property damage before February 2014. There isn't anything. And like I said, the pictures that you're looking at are from over a year after the policy long expired. So, I think it's important to know that there's just nothing there, even if you want to start looking at these supposed bent parts. If there are no other questions, I'll give the time to the court. Thank you. Judge Ho, I believe we are talking about fact issues. I'll make that clear. The Supreme Court and actually the Fifth Circuit has been clear that the coverage issue is distinct from the underlying liability issue. There was not a record in this arbitration. We all we got was an arbitration award. Now, we presented affidavits from Mr. Pitcock, from Roxanne Wigington about what happened at the arbitration and what the facts were and what the evidence was at the arbitration. Now the focus of the arbitration is different because it was a breach of contract issue. Did they, you know, do what they . . . and we also talked about negligence. That was in the underlying suit. But we talked about the defective construction and how that led to damages. And so I'm looking at National Fire Union Insurance Company versus Puget Plastics Corp., which is a Fifth Circuit case, says what's looked at in the underlying suit can be different than what's looked at in the insurance coverage suit. And I think there are fact issues here, especially with regards to the allocation and what damages should be allocated to the property damage . . . Is there a fact issue on when that damage might have occurred? That could be one of the fact issues, yes, Your Honor. Now . . . What do you make of the argument, what do you make of the facts underlying the argument just made by opposing counsel that the policy expired a few months after completion and there's a potential to have a leak, a leak over the land over the silo, whatever wind damage you were talking about, if it's relevant. There's nothing to show it occurred by the February of 2014. So we have emails from Mr. Irwin about the leaks that started happening in November of 2013. That was clearly within the policy period. The silos A.J. completed its work at the end of June 2013. The rest of the Irwin put up the rest of the work, the catwalks and the escalators and all that afterward. But we have emails and we have testimony transcripts from the deposition testimony of Mr. E.F. Irwin as well and he talks about late summer, early fall, I think there was light shower and I got a call from the co-op saying, I think we got it solved, I think we didn't see any leaks. And then 10 days later, a big storm blew in and moved everything around and it started leaking like a sieve again. And so what's happened every time a windstorm comes through, it moves it, it bends the metal and you have damage again and it's continuing damage. Now they talked about the damages and they talked about the district court or the arbitration panel, sorry, gave an award for deconstruction, repair and reconstruction. And those damages included, there were $805,000 and Roxanne Willington provided an affidavit on that. Those damages include the $114,000 for new roof kits, basically they had to buy a whole new roof kit and they used the parts from that to come up with enough parts to cobble together to reconstruct the silos. And there was additional miscellaneous bent parts that are also on this invoice as well. And so there's no doubt they had to come by new parts. Mr. Pitcock talks about, when he first went out there, he looked at and he talks about this in his affidavit and I think he talks about it in his deposition and report as well. First came out, he looked at it, it didn't look too bad from the ground. He gets up on the roof and he says, you know, this roof hasn't been bolted down correctly, the bolts haven't been secured correctly and the roof is supposed to be rigid and you can see from the damaged roof panels it's doing something like this. And so he gets up there and he says, you know, there's no way to repair this without deconstructing it and I showed you pictures of how they jack it down and jack it up. And so they had to take each of those sections down so they could get to the roof, replace the damaged roof parts and put the new parts back in and then jack it back up. And I want to read briefly from Mr. Pitcock's testimony and he talks about, he says when they were erected they had poor workmanship and the poor workmanship was leading it further down a point and somebody had been over there and they tried to repair these and as you could see they were where they tried to repair them. Not everything was addressed, not everything was right and by the wind and stuff of that nature these things were continuing to get worse. So we got evidence from Mr. Irwin's e-mails, deposition testimony that there was damage in the fall of 2013, we got evidence from Mr. Pitcock that it kept getting worse and I think we do have fact issues, Your Honor. Thank you. All right, counsel. Thank you. Thanks to both of you. We'll take this case under advisement. Thank you, Your Honor. I appreciate it.